# EXHIBIT C

## DECLARATION OF COUNSEL

## Case No:  1:20-cv-00376

```
 1                  UNITED STATES DISTRICT COURT

 2                   FOR THE DISTRICT OF IDAHO

 3

 4   ARTHUR BAKER,                  )
                                    )
 5                   Plaintiff,     )
             vs.                    )NO. 1:20-CV-00376
 6                                  )
     CLEARWATER COUNTY, CITY OF     )
 7   OROFINO, AMANDA BARLOW, MATT   )
     RUSSELL, and CHRIS GOETZ,      )
 8                                  )
                     Defendant.     )
 9   _____)

10

11          TRANSCRIPT OF THE VIDEO DEPOSITION OF

12                 DETECTIVE AMANDA BARLOW

13        HAD ON THE 12TH DAY OF JULY, 2021, AT 9:11 AM

14   _____

15

16

17

18

19

20

21

22

23

24

25     REPORTER:  KRISTI LYNN EVANS, RPR, WA & ID CSR NO. 661

                K & K REPORTING (208)743-1380
                  scheduling@kkreport.com

                              1
```

1    that might involve that person, whether a victim or

2    suspect?

3         A.  Not me personally but within the department, yes.

4         Q.  Do you recall any specifics about that?

5         A.  No.  No specifics, no, not of 20 years of it.

6         Q.  Just general memories of that being kind of a

7    principle?

8         A.  Yes.

9         Q.  Okay.  All right.  So you probably know why I

10   was a getting to that question.  We are here today

11   about an incident that occurred on July 30 of 2018.

12   Does that sound right?

13        A.  Yes.

14        Q.  And did that incident involve Art Baker and

15   Christine Nelson?

16        A.  Yes, it did.

17        Q.  Okay.  Now, who is Christine Nelson?

18        A.  She's a friend of mine.

19        Q.  How long have you been friends?

20        A.  Maybe eight to ten years.

21        Q.  Okay.  How did you meet one another?

22        A.  Through horses.

23        Q.  Okay.  I knew she had some interest in

24   horses.  Is that something that's kind of common around

25   here, horseback riding?

1        A.   Yes.

2        Q.   Are there like groups that get together and

3   ride?

4        A.   Sometimes, yeah.  Organized trail rides.

5        Q.   And do you still do that with her?

6        A.   Yeah.

7        Q.   What kind of horse do you have?

8        A.   An Arabian.

9        Q.   Really?

10       A.   (Nods head affirmatively.)

11       Q.   What color is it?

12       A.   A bay.

13       Q.   Wow.  Don't know if I've ever come close to

14   one, but I have seen them.  They are beautiful.  Are

15   they pretty spirited?

16       A.   Generally, but mine is not.  He's not normal

17   Arabian.

18       Q.   Did you ever ride with Christine on any

19   property that is now owned by Art Baker?

20       A.   Well, I've been to her house and up the easement

21   road, yes.

22       Q.   Okay.  And how often would you say, whether

23   on horse or on -- in a car, have you traversed the

24   easement that you are talking about, the access to her

25   residence?

1       A.  How many times have I been there?

2       Q.  Yeah.  Let's say over the course of your

3  relationship with her per month, can you estimate?

4       A.  It's not that often.  Like maybe three times a

5  year.

6       Q.  Okay.  How often, at least prior to July 30

7  of 2018, how often would you get together with

8  Christine?

9       A.  Well, it's so sporadic.  I have kids, and my kids

10 are busy and I don't get to just drop everything and go

11 riding every time, so just whenever I could.  Mostly in the

12 spring and summer.  Sometimes in the fall.  A handful of

13 times, not a lot.

14      Q.  Per each year?

15      A.  Yeah.

16      Q.  And other than horseback riding, do you

17 socialize together?

18      A.  Not very often.  She has been to like home parties

19 at my house a couple of times, you know, where women get

20 together and buy things, like cleaning products or candles.

21 She has been to my house a couple of times like that but --

22      Q.  Okay.  Ever go out shopping with her?

23      A.  Shopping?

24      Q.  Yes.

25      A.  I don't -- maybe once.

1          Q.  I can remember that growing up here.  Lots of

2     curvy roads and ups and downs, right?

3          A.  Yes.

4          Q.  Next I'd like to ask you about your knowledge

5     of the relationship between Art Baker and Christine

6     Nelson.  You're obviously aware that they have been in

7     past disputes before?

8          A.  Yes.

9          Q.  And those have, as I understand it, have

10    almost entirely focused upon property disputes; is that

11    your understanding?

12         A.  Yes.

13         Q.  Can you tell me when about you first became

14    aware of these property disputes?

15         A.  She was still married to her husband, ex now,

16    Paul.

17         Q.  Paul Nelson?

18         A.  I remember, uh-huh (affirmative).  Early on in our

19    friendship, I believe, I was aware.

20         Q.  Late -- be late 2000, early 2000 teens or

21    since then?  Well, do you know when Art acquired his

22    property?

23         A.  No.

24         Q.  Okay.  But the disputes have been going on

25    for quite sometime?

1          A.   Since I have become friends with Chris, yes.

2          Q.   Is that something she's confided in you over

3     the years?

4          A.   Yes.

5          Q.   Has she done so in both personal and

6     professional context as a law enforcement officer, you

7     have talked to her about that?

8          A.   Yes.

9          Q.   Do you remember an occasion when responding

10    to a call from Christine, that she thought Art was

11    trying to kill her by poisoning her spring water?

12         A.   Yes.

13         Q.   Do you remember about when that was?

14         A.   Okay.  This happened July 30th, and I was there in

15    May and June.  So it was in June of '18.

16         Q.   Okay.  Same year?

17         A.   Yep.  I had to be there May, June, and July.

18         Q.   Okay.  Let's start with May.  What happened

19    in May?

20         A.   May didn't have anything to do with Christine

21    Nelson.

22         Q.   Okay.  What was that?

23         A.   It was another neighbor, Darrel Gray, and he

24    said -- reported that Art had taken a game camera off of his

25    fence line.  And so I had to talk to Art about that, and I

1    drove to his house and talked to him about it.  May

2    something, middle of May of '18.

3         Q.  Okay.  What was the final result or

4    disposition of that call?

5         A.  Unfounded.

6         Q.  So do I understand that he -- that Darrel

7    Gray -- he thought that Art had done it?

8         A.  Uh-huh (affirmative).

9         Q.  But you found that there wasn't enough

10   evidence?

11        A.  He never admitted to me that he did it, even

12   though his picture was on the camera.

13        Q.  Whose pictures?

14        A.  Art's picture was on the camera.  And I confronted

15   him about that, and he denied it.  And that was it.

16        Q.  And you concluded that it was -- the

17   allegations were unfounded?

18        A.  Yeah, uh-huh (affirmative).

19        Q.  All right.  May and then June, you said?

20        A.  June was when Christine Nelson called to report

21   that someone had messed with her water.

22        Q.  What did she say about that, briefly?

23        A.  The cistern, there was dead weeds around it, and

24   then maybe the valve had been shut off.  And then I went to

25   Art Baker's house, and we walked and he showed me where it

1  was and explained things and I documented it.

2      Q.  Did Christine accuse Art of trying to kill

3  her?

4      A.  I believe she did, yes.  Putting weed spray around

5  her cistern.

6      Q.  When you talked to Art did you learn that he

7  had rights to the water as well?

8      A.  Yes.

9      Q.  And what did he say about the accusation?

10     A.  I don't remember.

11     Q.  Was he just trying to kill weeds?

12     A.  Yeah.

13     Q.  Did anything ever come of that?

14     A.  No.

15     Q.  Before July 30 of 2018, other than those two

16  incidents, did you respond to any call about a property

17  dispute between Mr. Baker and Ms. Nelson?

18     A.  No.

19     Q.  Did you hear of other disputes from other

20  deputies?

21     A.  Yes.

22     Q.  Okay.  Do you recall any of those disputes

23  that occurred before July 30 of '18?

24     A.  Do I recall them?

25     Q.  Yeah.  Do you recall generally what they were

1    about?

2         A.  All property.  I remember one, a barbwire fence

3    got cut.  I believe that was right before July 30th at some

4    point.

5         Q.  Okay.

6         A.  All just property, property, property.

7         Q.  Folks take their property rights pretty

8    seriously around here?

9         A.  (Nods head affirmatively).  Yes.

10        Q.  She took hers, it sounds like, pretty

11   seriously as well, right?

12        A.  Everyone does.

13        Q.  Is that a common thing?

14        A.  Yes.

15        MR. WOOD:  All right.  Can we take a quick break?

16        MR. STROMBERG:  Yes.

17        VIDEOGRAPHER:  We are now going off the record, and

18   the time is approximately 9:41 a.m.

19                        (Recess at 9:41 a.m.)

20                        (Reconvened at 9:49 a.m.)

21        VIDEOGRAPHER:  We are now going back on the record,

22   and the time is 9:49 a.m.

23        Q.  (By Mr. Wood) All right.  We are back on the

24   record.  I was trying to locate a recording, and I

25   believe it is the recording that you mentioned earlier

1    is that right?

2         A.  Yes.

3         Q.  Okay.  And I'll just state for the record

4    this was the document -- these documents were produced

5    in discovery by Defendants in this case.  Your primary

6    report, is that pages 1.001 through .003?

7         A.  Correct.

8         Q.  All right.  And did you, in preparing that

9    report, then, review your recording?

10        A.  Yes.

11        Q.  Okay.  And did you produce both your report

12   and the recording to your attorneys in this case?

13        A.  Yes.

14        Q.  Okay.  The arrest video, I don't believe I

15   have it.  Let me just doublecheck.

16        MR. STROMBERG:  Are you referring to the arrest audio?

17        MR. WOOD:  Audio.  Thank you for the clarification.

18   The arrest audio.  Are we okay, Counsel, just referring to

19   it as the arrest audio?

20        MR. STROMBERG:  Yes.

21        Q.  (By Mr. Wood) To your knowledge, is there

22   only one audio of -- from the time you arrived until

23   Art was arrested?

24        A.  Officer Russell had a video.

25        Q.  Video.  Okay.  And we have that as well, but

1   you only made one audio recording; is that right?

2          A.  I made two.

3          Q.  Two?

4          A.  Yes.

5          Q.  And would you explain, please.

6          A.  The second one was when Ms. Baker came back to

7   move the vehicle.

8          Q.  Okay.  Was that before or after Art was

9   arrested?

10         A.  After.  He had already been transported.

11         Q.  Okay.  And where -- and Art's vehicle was

12  parked on the -- I'm trying to think -- Harmony Heights

13  side of the gate on Legacy Drive?

14         A.  Yes.

15         Q.  Okay.  All right.

16         MR. STROMBERG:  Just for clarification, Jason, would

17  you like the report marked as -- by the Court Reporter?

18         MR. WOOD:  Yeah, let's go ahead and mark that.  I

19  mean, it's short enough.  Number 1 is fine.

20                  (Deposition Exhibit No. 1

21                   marked for identification.)

22         Q.  (By Mr. Wood) All right.  How was it that you

23  got called out to Mr. Baker's property?

24         A.  Christine Nelson called the Sheriff's Office, and

25  I responded.

1          Q.  Okay.  Were you dispatched, or were you there
2     at the office when you received the call?
3          A.  I was at the office.
4          Q.  Did you receive the call from Christine?
5          A.  No.  Dispatch did.
6          Q.  Okay.  And what were you told?
7          A.  I was told that he was blocked -- she was blocked
8     in behind a gate.
9          Q.  Okay.  All right.  I'm going to go -- now,
10    there are -- there is a driveway at the time with a
11    gate on it right at Harmony Heights Road; is that
12    right?
13         A.  On Legacy, yes.
14         Q.  Okay.  And if that road through the gate is
15    taken, then it will take you to Mr. Baker's residence?
16         A.  Down Heritage.
17         Q.  Okay.  And then it will also take you to
18    Ms. Nelson's?
19         A.  Right, on Appaloosa.
20         Q.  On Appaloosa.  Okay.  All right.  You know
21    what, I think I'm going to ask you -- I don't have a
22    pad.  I usually just use my computer but, Bentley,
23    would you mind handing the witness a blank sheet?  And
24    I'm going to ask you to give a rough drawing, not to
25    scale, because I don't think we have a drawing, per se,

1   of where this happened, although we have some

2   photographs.  But I think it would be helpful to have

3   kind of an overhead view of how these roads work.  So

4   would you please draw for us the Harmony Heights Road

5   and where Legacy Drive --

6        A.  Harmony Heights is here (indicating).

7        Q.  Okay.

8        A.  Legacy takes off down here, and then it Y's down

9   here, and here is Heritage to Art's house (indicating) and

10  then --

11       Q.  Okay.  And that one that's Heritage Heights,

12  you just marked, okay.  Go ahead.

13       A.  And then you go on down here, and then Chris'

14  house is down here (indicating).

15       Q.  All right.  And there is another -- there is

16  another access to Legacy Drive off of Harmony Heights

17  Road; is that right?

18       A.  Yes.

19       Q.  And would you draw where that is just

20  roughly, please.

21       A.  Roughly here (indicating).

22       Q.  Okay.  And would you -- let's see --

23       A.  Can you see?

24       Q.  Yeah.  Thank you.  I have got a general idea,

25  but would you please just up above write Harmony

1  Heights.

2       A.  Harmony Heights, I just put HH.

3       Q.  Harmony Heights -- I mean Legacy Drive.  I

4  apologize.

5       A.  Sorry.  This is Legacy.

6       Q.  I got those mixed up.

7       A.  (Indicating.)

8       Q.  Okay.

9       A.  This is Legacy.

10      Q.  Okay.  Yeah, that long one that's heading,

11 according to the drawing, top to bottom?

12      A.  Yeah.

13      Q.  Okay.  All right.  Now, before July 30th of

14 2018, had you ever received any information from Art or

15 anyone else that -- whether or not Ms. Nelson had a

16 valid easement to access Legacy Drive at the point

17 where it connects with Harmony Heights?

18      A.  That was my understanding, yes.

19      Q.  And what was that understanding based on?

20      A.  That was the road that we used to go there for

21 calls for service.  That was the graveled maintained road

22 that I used to go to her house; that I used to go to Art's

23 house for calls for service and for personal.

24      Q.  Okay.  So that's based just primarily upon

25 your experience in just using the road; is that right?

1        A.   Yes.

2        Q.   And did you ever have, before July 30 of '18,

3   a discussion with Christine Nelson specifically about

4   that?

5        A.   She may have mentioned that her and Art are in

6   property disputes about it, but I don't recall it being

7   about that road.

8        Q.   In particular?

9        A.   Yeah.

10       Q.   Okay.  All right.  Before July 30 of 2018,

11  were you aware that Mr. Baker -- his position was that

12  she did not have an easement but just simply permission

13  to use that drive on Legacy Drive from Harmony Heights?

14       A.   That's what he told me on July 30th, but before

15  that, knowing that, no, we never talked about it.  If we

16  did, I don't recall it.

17       Q.   Okay.  All right.  Did you ever use that

18  cutoff that you see?

19       A.   This one?

20       Q.   Yes.  That --

21       A.   Yes (indicating).

22       Q.   Had you ever used that before July 30th of

23  '18?

24       A.   Riding horses with Chris, yes.

25       Q.   Okay.  And did you ride horses there at any

1    time before July 30 when there was a gate on that road?

2         A.  This road (indicating)?

3         Q.  Yes, on the cutoff road.

4         A.  There was a gate there, a wire gate.

5         Q.  Okay.  And when you went through that -- used

6    that cutoff road, what did you do when you encountered

7    the gate?

8         A.  I don't remember if it was opened or closed.

9         Q.  Okay.

10        A.  It might have been sometimes open, sometimes

11   closed.

12        Q.  All right.

13        A.  But we rode that way because there's a cattle

14   guard right here, and you can't cross a cattle guard with

15   horses.  So you went that way.

16        Q.  Right.  The cattle guard was on Legacy Drive?

17        A.  Yes.

18        Q.  Okay.  Do you recall generally how long

19   before July 30 of 2018 was the last time that you -- or

20   the nearest time that you had ridden your horses on

21   that cutoff road?

22        A.  No.

23        Q.  Okay.  Do you think maybe the same year?

24        A.  Yeah, probably the same year.

25        Q.  All right.  And you said you rode with her --

1          Q.  From the upper left-hand corner?

2          A.  Uh-huh (affirmative) this direction, and I parked

3     in a pull-out like right over here.  So this is me.  I'll

4     put a B on it, and Art Baker's vehicle was right here

5     (indicating) Baker (indicating).  There was a guy on a

6     4-wheeler, Darrel Gray.  He was right here on the road

7     (indicating).  Darrel.

8          Q.  You were on a pull-out just off Harmony

9     Heights?

10         A.  Uh-huh (affirmative).  To get off the roadway.

11         Q.  Okay.

12         A.  Darrel Gray was on a 4-wheeler right here, and

13    then Todd Perry's vehicle was somewhere around in here

14    (indicating).  I think it was maybe in front of Art Baker's,

15    maybe half on Legacy, half on the county road.  I don't

16    remember exactly, but that's Todd Perry vehicle

17    (indicating).

18         Q.  Okay.  He was an ex-husband of Christine

19    Nelson?

20         A.  Ex, ex-husband.

21         Q.  Okay.

22         A.  Then the gate, Art Baker's Ford pickup was here

23    (indicating).

24         Q.  And when you say here, he was on the side of

25    the gate closest to Harmony Heights?

1        A.   Correct.

2        Q.   Okay.  And was the gate closed when you

3   arrived?

4        A.   Yep.  Closed.

5        Q.   Okay.  Was it locked?

6        A.   I don't think it was locked yet, but it got locked

7   while I was there.  And then Chris Nelson was back here in

8   her vehicle (indicating).

9        Q.   Behind the gate?

10        A.   Behind the gate in her work truck.

11        Q.   Who did she work for?

12        A.   Chris Nelson.  She works for Clearwater Glass.

13        Q.   Okay.

14        A.   And then behind that was another vehicle, which

15   was Art Baker's wife's.  I can't remember her name right

16   now.

17        Q.   Diane?

18        A.   Ms. Baker, her car (indicating).  So I had all of

19   those people on the scene when I got there.

20        Q.   Okay.  Were -- you said Christine Nelson was

21   in her car?

22        A.   She was in her vehicle.

23        Q.   Okay.  And was anybody else out of their

24   vehicle?

25        A.   Todd Perry was standing next to her, and Art Baker

1   was videoing them when I showed up.  As I approached, I told

2   Darrel Gray to leave.  I didn't need him there, another

3   neighbor, so I said you can leave.  He left, and --

4        Q.  I don't remember there being anything on the

5   audio with Darrel Gray.  Did you turn on the audio

6   after that?

7        A.  No.  I told him -- you can hear me say, you can

8   go.

9        Q.  Okay.  Well, I guess now is --

10       A.  It was at the very beginning.

11       Q.  Okay.  That would be the appropriate time to

12  start the audio.  I'm going to fast forward this.

13              (Audio played as follows:)

14       DETECTIVE BARLOW:  You can go.

15       A.  That was me saying you can go.  Then you hear a

16  4-wheeler start, and he leaves.

17       DETECTIVE BARLOW:  Art.  Art.

18       MR. BAKER:  This is Mandy Barlow, the sheriff's --

19       DETECTIVE BARLOW:  What's going on, Art?

20       MR. BAKER:  I came up here.  I put the notice on the

21  gate that the permission was revoked.  She just ripped it

22  off.

23              (Audio stopped.)

24       Q.  (By Mr. Wood) So he just indicated that --

25  let me see if I have got the time right.  It is marked

1      MS. BAKER:  So are you -- are you a personal friend of

2   hers?

3      DETECTIVE BARLOW:  No.

4                    (Audio stopped.)

5      Q.  (By Mr. Wood) So you just said that this is

6   ridiculous.  What was your understanding of the

7   dispute?

8      A.  Property, the driveway.

9      Q.  Okay.  And what did you mean when you said

10  that it was ridiculous?

11     A.  That he would not allow her to leave the driveway

12  and go to work.

13     Q.  Okay.  Did you understand from what he was

14  saying that she could go another way; that he couldn't

15  deny her permission to use another way to get out,

16  using that cutoff in the diagram you drew?

17     A.  Correct.

18     Q.  Okay.

19                (Audio played as follows:)

20     DETECTIVE BARLOW:  Yes, I am, but this is ridiculous.

21     MS. BAKER:  Okay.  That's what's entering into this.

22  Think about it for a few minutes.  Why can't she use that

23  one?  That's hers.  That's the one --

24     DETECTIVE BARLOW:  I have no idea why.

25                    (Audio stopped.)

1    time of July 30th of 2018, that cutoff road?

2         A.  No.  It looks more opened up, and the dropoff

3    doesn't look as extreme.  But I don't know who took these or

4    when.

5         Q.  Okay.  All right.  And can you estimate for

6    me what is the distance from the point -- so you see in

7    the upper left-hand corner that photograph with the car

8    in it, it connects down at the bottom of that

9    photograph with Legacy Drive; is that right?

10        A.  Correct.

11        Q.  And then if you take that Legacy Drive, which

12   is the one that is wider and has more gravel on it, if

13   you take that and head, you know, upwards in the

14   direction that car is going, can you estimate roughly

15   how far it is from that point to where Christine Nelson

16   was parked as indicated on Exhibit 2?

17        A.  So where -- how far up this road was Christine

18   Nelson parked on July 30th?

19        Q.  Yes.  Yes.

20        A.  Well, the guard -- I'm sorry, cattle guard is --

21   comes right down across here (indicating).

22        Q.  Across that fence?

23        A.  Yeah.  So it's like up here (indicating), and this

24   isn't a very good picture, maybe 100 yards.

25        Q.  Okay.  All right.  All right.  Let's go back

1          MS. NELSON:  He keeps shutting the gate.  I do not

2     need permission.  I have a legal easement.

3          DETECTIVE BARLOW:  Uh-huh (affirmative).

4                    (Audio stopped.)

5          Q.  (By Mr. Wood) So at this point she tells you

6     that she has a legal easement for that Legacy Drive

7     access, correct?

8          A.  Uh-huh (affirmative).

9          Q.  All right.  And I don't believe -- your

10    response was that you understood that that was the

11    case?

12         A.  Yes.

13         Q.  Okay.

14                    (Audio played as follows:)

15         MS. NELSON:  -- that's standing.  I called my lawyer.

16    My lawyer says this is beyond civil now.

17         DETECTIVE BARLOW:  Uh-huh (affirmative).

18         MS. NELSON:  I want him arrested because he's

19    disturbing the peace for disorderly conduct and for

20    threatening me.

21         DETECTIVE BARLOW:  What did he do?

22                    (Audio stopped.)

23         Q.  (By Mr. Wood) So she said she talked to her

24    lawyer, and her lawyer said this is beyond civil now,

25    and that she wanted Art arrested for disturbing the

1    peace and what was the other one?

2         A.   Threatening her.

3         Q.   Threatening her.  Okay.  And then you asked

4    her how -- how is he threatening you, right?

5         A.   Yes.

6              (Audio played as follows:)

7         DETECTIVE BARLOW:  How did he threaten you?

8         MS. NELSON:  Because I can't leave.

9                   (Audio stopped.)

10        Q.   (By Mr. Wood) So it's because she can't

11   leave, right?  Is that what she said?

12        A.   Uh-huh (affirmative).

13        Q.   And was it your understanding from that that

14   was not a threat of any physical violence?

15        A.   Yes.

16        Q.   Okay.  What kind of threat -- did you

17   understand that to be a threat?

18        A.   No.  That's why I asked her how he threatened her.

19        Q.   Okay.

20              (Audio played as follows:)

21        MS. NELSON:  And she's got me blocked in even though

22   she came afterwards, but now I can't go anywhere.

23                   (Audio stopped.)

24        Q.   (By Mr. Wood) Okay.  So she felt threatened

25   because she felt like she was blocked in; is that

1  right?

2      A.  I guess.

3      Q.  Okay.  And she said something about someone

4  pulling up behind her?  Was that --

5      A.  Ms. Baker pulled in behind her.

6      Q.  So at the time that this is occurring, you

7  are questioning Christine was Diane Baker's car parked

8  behind Christine's?

9      A.  Yes.

10              (Audio played as follows:)

11      MS. NELSON:  (Crying.) Then I called him this morning,

12  and he said I can ask for that.

13      DETECTIVE BARLOW:  That what?

14      MS. NELSON:  I can ask for that because he's

15  threatening me.  See, now he's getting out another chain,

16  because he wanted me to use this other gate, but he has got

17  it chained and padlocked, too.

18              (Audio stopped.)

19      Q.  (By Mr. Wood) Okay.  So she just said there

20  is another road, but there's a gate that is chained and

21  padlocked, too; is that right?

22      A.  That's what she said.

23      Q.  Okay.

24      A.  You can't see it from where we were.

25      Q.  Right.  It was blocked by tall bushes, is

1                    (Audio stopped.)

2        Q.  (By Mr. Wood) So just to recap, then, she

3   indicated that she could use that road; it is just her

4   truck bottoms out?

5        A.  That's what she said.

6        Q.  What did you understand her to mean by

7   bottoming out?

8        A.  She could get possibly high centered on her truck,

9   and I know that dropoff was pretty steep because I've rode

10  my horse on it.

11       Q.  All right.  I'm going to fast forward at this

12  point.  I'll just represent to you, to move things

13  along, that next you go talk to Todd Perry?

14       A.  (Nods head affirmatively.)  Okay.

15       Q.  Does that sound right?

16       A.  Yes.  I'm walking him back so he leaves.

17                  (Audio played as follows:)

18  DETECTIVE BARLOW:  Did you get called here, or you

19  were just driving by?

20  MR. PERRY:  Oh, I saw he was here.

21  DETECTIVE BARLOW:  Okay.

22  MR. PERRY:  I know that he's intimidating her.

23  DETECTIVE BARLOW:  Uh-huh (affirmative).

24  MR. PERRY:  That's why I was going to go through and

25  help her out.

1           DETECTIVE BARLOW:  Gotcha.

2           MR. PERRY:  You know, because he is a bully.

3           DETECTIVE BARLOW:  Uh-huh (affirmative).

4           MR. PERRY:  And I am well aware of what's going on.

5      That's why I was trying to get through here.

6           DETECTIVE BARLOW:  Okay.  All right.  Thank you.

7                     (Audio stopped.)

8           Q.  (By Mr. Wood) All right.  So, he called Art a

9      bully, right?

10          A.  Yes, he did.

11          Q.  All right.  And how did he say he ended up --

12     you asked him whether or not he got a call, and that's

13     why he arrived there at that scene.  And his response

14     was, do you remember?

15          A.  I think he was just driving by to go to work and

16     saw that Art was parked in front of the gate.

17          Q.  Okay.  And was there any question in your

18     mind that that property -- that that Legacy Drive drove

19     on was Art's property?

20          A.  No.

21          Q.  And Art -- you learned that Art had told him

22     that he could not come onto his property and use that

23     road; is that right?

24          A.  Art had told me that, yeah, that he was

25     trespassing.

1          Q.  All right.

2                    (Audio played as follows:)

3          DETECTIVE BARLOW:  You are now not blocked in, and you

4    have now padlocked it.  Is it padlocked down there?  Is the

5    gate down there padlocked to where she can't get out?

6          MS. BAKER:  It's the other gate.  She cut that one.

7          DETECTIVE BARLOW:  I know, but is it padlocked?

8          MR. BAKER:  No.  There is no lock on the other gate.

9    She cut the fence and went through --

10         DETECTIVE BARLOW:  Okay.

11         MR. BAKER:  -- and it has been down ever since she cut

12   it.

13         DETECTIVE BARLOW:  I know.

14                   (Audio stopped.)

15         Q.  (By Mr. Wood) Okay.  So just to recap what

16   was just said at about ten minutes, 20 seconds, on the

17   recording.  You walked over to Art and told him, now

18   you are unblocked.  I assume you mean by that that Todd

19   had backed out and now Art could move his vehicle

20   backwards, correct?

21         A.  Move it out of the way, yeah, wherever.

22         Q.  And then you said something about Art

23   chaining and padlocking the gate on Legacy Drive,

24   correct?

25         A.  Yes.

1   either way.

2        MS. BAKER:  (Inaudible.)

3        Q.  (By Mr. Wood) So it sounds like you just said

4   that your concern is that she can't go to work,

5   correct?

6        A.  Because Ms. Baker's car was behind her and a

7   locked gate was in front of her and a vehicle.

8        Q.  Okay.  And did you ask Diane Baker to move

9   her car?

10       A.  Yes.

11       Q.  And did she move it?

12       A.  Yes.

13            (Audio played as follows:)

14       DETECTIVE BARLOW:  Can you go, too, because you guys

15  right now pretty much have her blocked in?

16       MS. BAKER:  I just -- I just came in.  I know.  But

17  that was because he asked me to come down here.

18       MR. BAKER:  (Inaudible.)

19       DETECTIVE BARLOW:  I know.  And now we are not being

20  ganged up on.

21       MS. BAKER:  I will back up.

22       DETECTIVE BARLOW:  So you can head out, and then

23  you -- what was that?  You can go, ma'am.  It's okay.  Okay.

24       MR. BAKER:  She will have to leave out that other

25  road.

1    that look like the Hyundai he was talking about in

2    Exhibit 3, the photograph, on the cutoff road?

3         A.  Yeah, probably, but I wasn't focusing on that car,

4    so --

5         Q.  Christine didn't contend that there was --

6    you know, that she needed a 4-wheel drive to get across

7    that road, did she?

8         A.  She didn't.  She just said she could bottom out.

9         Q.  Okay.

10                 (Audio played as follows:)

11        MR. BAKER:  Well, I guess it has to come to a point

12   where if I -- if she can force her way through here to use

13   it, then she can establish a prescriptive easement.  I have

14   been letting her come through by permission.

15        DETECTIVE BARLOW:  That is civil.  That is a civil

16   issue.

17                 (Audio stopped.)

18        Q.  (By Mr. Wood) Okay.  So you indicate that it

19   is a civil issue whether -- that he was concerned about

20   her using the road; that it might establish a

21   prescriptive easement on Legacy Drive, right?

22        A.  Yes.

23        Q.  And you said that's a civil issue?

24        A.  Yes.

25                 (Audio played as follows:)

1          MR. BAKER:  My wife backed up so that she can back

2    down and take that other road.

3          DETECTIVE BARLOW:  No.  No, she is coming this way.

4    You need to unlock it and let her go.

5          MR. BAKER:  (Inaudible).

6          DETECTIVE BARLOW:  You'll show me what?

7          MR. BAKER:  Drive around (inaudible).

8          DETECTIVE BARLOW:  No.  You are going to unlock this

9    now, or you are going to go to jail for resisting and

10   obstructing.  What do --

11                    (Audio stopped.)

12       Q.  (By Mr. Wood) Okay.  You just said, you are

13   going to unlock this gate now, or you are going to jail

14   for resisting and obstructing, correct?

15       A.  Yes.

16       Q.  Now, would you agree that -- that it's not --

17   you can't arrest somebody for resisting and obstructing

18   without probable cause for some underlying criminal

19   violation, correct?

20          MR. STROMBERG:  Object to the extent it calls for a

21   legal conclusion.  You can answer.

22       Q.  (By Mr. Wood) And this is based on your

23   understanding over the course of decades of criminal

24   law enforcement.  What is your understanding as to

25   whether or not you can cite someone or charge someone

1    with resisting and obstructing if there is no reason to

2    believe that that person has committed a crime?

3         A.  False imprisonment.

4         Q.  Okay.  So false imprisonment is the one,

5    correct?

6         A.  Yes.

7                   (Audio played as follows:)

8    DETECTIVE BARLOW:  What do you want to do?

9    MR. BAKER:  I can tell who you are friends with.

10   DETECTIVE BARLOW:  What do you want to do?  Unlock it

11   or go to jail?

12                   (Audio stopped.)

13        Q.  (By Mr. Wood) So at about 12:15 on the

14   recording you have given him a choice:  Either you open

15   the gate now and let her go through this -- on this

16   road, or you go to jail, correct?

17        A.  Correct.

18                   (Audio played as follows:)

19   DETECTIVE BARLOW:  Do you want to go to jail?  Unlock

20   it or go.  I am not in the mood.

21                   (Audio stopped.)

22        Q.  (By Mr. Wood) You say, you are not in the

23   mood.  What did you mean by that?

24        A.  Just for --

25        Q.  You seem pretty exasperated at that point.

1        A.   Yeah.   I just couldn't understand why, why I was

2   there on a driveway issue and a gate.

3        Q.   You were frustrated by the dispute?

4        A.   Yes.

5                 (Audio played as follows:)

6        MR. BAKER:  (Inaudible).

7        DETECTIVE BARLOW:  No.  Nope.

8                      (Audio stopped.)

9        Q.   (By Mr. Wood.) Okay.  So you gave him the

10   choice here, and he says, I'm going to film you,

11   correct?

12        A.   And he tries to reach into his pocket.

13        Q.   Okay.  And at that point you didn't have any

14   reason to believe that Art had a weapon or anything,

15   did you?

16        A.   But I didn't know.

17        Q.   Okay.  But from this -- at this point you had

18   had encounters with Art before.  He was 72 years old,

19   right?

20        A.   Yes.

21        Q.   All right.  Had there ever been any report to

22   you by anyone that he was a risk for physical violence?

23        A.   No, but that's how officers get killed when they

24   are complacent.  That's officer safety 101.  People don't

25   get to reach into their pockets.

1      Q.  Okay.  But he said what he was going to do
2  right?  He said he wanted to record it?
3      A.  In the process of me grabbing ahold of him,
4  because he was going into his pocket.
5      Q.  Did you have a dash cam on your car?
6      A.  No.
7          (Audio played as follows:)
8  DETECTIVE BARLOW:  Go to jail.  Turn around.  No.
9  MR. BAKER:  Here's the keys.
10  DETECTIVE BARLOW:  (Inaudible.)
11          (Audio stopped.)
12      Q.  (By Mr. Wood) Okay.  At this point you said,
13  okay, you are going to jail, right?
14      A.  Yep.
15      Q.  And he said, no, here's the keys, correct?
16      A.  Yes.
17      Q.  And, in fact, when he went to reach into his
18  pocket with the one hand he had his keys holding out
19  towards you at the same time; is that right?
20      A.  I heard the keys drop on the ground, because I
21  later picked them up, but I don't remember the key -- he
22  wasn't trying to hand them to me.
23          (Audio played as follows:)
24  DETECTIVE BARLOW:  -- not enough.
25          (Audio stopped.)

1       Q.   (By Mr. Wood) Okay.  Now you threatened to

2   tase him, correct?

3       A.   Yes.

4       Q.   And why was that?

5       A.   Because he was resisting me.

6       Q.   How he was he resisting?

7       A.   Well, he was trying to reach his hand into his

8   pocket, and I had a hold of his hand.  I tried to get him

9   into a wrist lock, but he's taller than me and got him into

10   an arm bar and pushed him up against his truck, and he kept

11   moving up the truck, just trying to get away from me.

12       Q.   Okay.  Would you call that -- would you call

13   that passive resistance?

14       A.   Passive?

15       Q.   Uh-huh (affirmative).

16       A.   No.

17       Q.   Okay.  Do you know the difference between

18   active and passive resistance?

19       A.   Yes.

20       Q.   What is it?

21       A.   Passive is when they are just kind of -- you can

22   overpower them, which I did.  He was actively trying to get

23   away from me.

24       Q.   Later on in the recording he says -- he

25   explains, and I won't go through all of it, but you

1    tell me if you recall this.  He explained to you later,

2    look, I was just trying to get my phone in my pocket.

3    I didn't want my phone to get lost?

4         A.  Dropped.

5         Q.  Or dropped, right.

6         A.  That's what he said, yes.

7         Q.  Okay.  Was that --

8         A.  He even was saying that in the moment:  I'm just

9    trying to get my phone out or in.  I don't -- he said both,

10   trying to get my phone out, trying to put my phone away.

11        Q.  Okay.  I'm sorry.  Go ahead.

12        A.  But I told him multiple times to -- that he was

13   going to jail and to put his hands behind his back and give

14   me his hand, and he wouldn't.

15        Q.  At that point when you told him to put his

16   hands behind his back, did he have his phone in his

17   hand?

18        A.  I don't remember.  I think he was reaching in to

19   get it because he was saying, I want to get video of you, as

20   soon as I was grabbing his hand, because I didn't want his

21   hands going in his pockets.

22        Q.  Okay, but it's possible that he had the phone

23   in his hand, and he was trying to put it away, like he

24   said?

25        A.  Maybe while we were -- while he wouldn't give me

1        MR. STROMBERG:  Objection, legal conclusion,

2   speculation.  You can answer.

3        A.  She chose -- she did not want to use that road

4   because it was rough, and she bottomed out.  It was not

5   brushed out like this then (indicating).

6        Q.  (By Mr. Wood) Well, how do you know?

7        A.  Because I looked at pictures that were taken when

8   that gate was cut, by my lieutenant, and it looked

9   different.

10        Q.  Do you know where those photographs are?

11        A.  In the case, the lieutenant's case.  I think I put

12   the case number in my report somewhere.  But, like I said,

13   this looks more brushed out than it was prior when I was

14   there.

15        Q.  Okay.  Well, when you were there.  So at

16   sometime in 2018 when you were on horses and you rode

17   through --

18        A.  Yeah.  It was not brushed out like that.  It was

19   more like a 4-wheeler trail.

20        Q.  Okay.  Is there any reason to believe that

21   she couldn't -- that that brush would have prevented

22   her from using that road?

23        A.  Well, she has a truck that -- it's like a glass

24   truck where it's got these tall racks on to haul windows and

25   glass, so it would probably scrape on the brush.  And also

1    the road above was a major cut bank, and it just did not

2    seem reasonable to use that road.

3         Q.  Okay.  Does -- do you believe that -- that

4    it's a crime to -- not to prevent somebody from leaving

5    but to make them use a less convenient means of egress?

6    Is that what you believed at the time when you arrested

7    Art?

8         MR. STROMBERG:  Objection, ambiguous.  You can answer.

9         A.  No.

10        Q.  (By Mr. Wood) Okay.  What was your

11   understanding in July of 2018 as to what constituted

12   the crime of false imprisonment?

13        A.  Because he was not allowing her to leave on the,

14   what I understood, the easement road.

15        Q.  Okay.  And what was -- so you assumed that

16   she had the legal right to use that road, correct?

17        A.  Yes.

18        Q.  And that assumption, though, was not based

19   upon any confirmation, legal confirmation?

20        A.  My knowledge, my experience.  Yeah, in the past

21   that's the way it was always -- you always go to their

22   houses.

23        Q.  Okay.  But you testified before, people use

24   --

25        A.  Yes.

1          DISPATCH:  Mile below Greer.  I need you to use your

2    response code to Appaloosa Drive.  We just got a call

3    (inaudible) needing assistance.

4          MR. BAKER:  It's too tight.  Hurting me.

5          DETECTIVE BARLOW:  Just stop.

6                         (Audio stopped.)

7          Q.  (By Mr. Wood) At about 14:10 he says it is

8    too tight.  It is hurting me, correct?

9          A.  Yep.

10         Q.  And was it pretty clear to you that it was

11   painful to him?

12         A.  That's what he was saying, yes.

13         Q.  And, I mean, by the way he was saying it

14   could you hear it in his voice as well?

15         A.  Yes, but he was still resisting me.

16         Q.  How was he resisting you?

17         A.  He was not giving me his hand.  I still had to

18   pull on it to get it in the handcuff.

19         Q.  Did he explain to you, though, that he

20   doesn't bend very well, and that's why?

21         A.  Yeah.

22                    (Audio played as follows:)

23         MR. BAKER:  It's hurting.

24                    (Restarting audio as follows:)

25         DETECTIVE BARLOW:  No.  You are going to unlock --

1          A.   That's what he said.

2          Q.   All right.   After you got the cuffs on, how

3    was he resisting?

4          A.   He didn't, after I got them on.

5          Q.   So what prevented you at that point from

6    loosening them?

7          A.   Because I was by myself and when you put the key

8    in to loosen it and you have no help and he was already

9    resisting me and not listening or doing what I was asking

10   him to do, he could have pulled out of the handcuff and hurt

11   me with it.

12         Q.   With the --

13         A.   With the cuff.

14              (Audio played as follows:)

15         MR. BAKER:   And she said, no, you are under arrest,

16   and so she would not -- she -- from that point she says I'm

17   resisting arrest.   I had my phone in my hand.   I said, let

18   me put my phone in my pocket.   I am going to drop it.   And

19   so then she kept --

20              (Audio stopped.)

21         Q.   (By Mr. Wood) So there Art says he had his

22   phone in his hand and what he was trying to do, that

23   you thought was resisting, was get his phone in his

24   pocket so he wouldn't drop it.   Is that what he said?

25         A.   To his wife.

1          Q.  Okay.  And did you hear that at the time?

2          A.  Yeah.

3          Q.  And as you sit here today, do you have any

4    reason to believe that that's not what he was trying to

5    do?  That's not why he was -- that's why you thought he

6    was resisting?

7          A.  It was -- he was trying to stick his hands in his

8    pocket, because he's already saying at first he was trying

9    to get his phone to video me, but then he just said he was

10   trying to put the phone away.  So he was trying to reach in

11   his pocket, which is a big no-no.

12         Q.  But you never told him to not reach into his

13   pockets, did you?

14         A.  I told him to give me his hand.  He was under

15   arrest.

16         Q.  Okay.

17              (Audio played as follows:)

18        MR. BAKER:  -- force me, and I stuck my phone in my

19   pocket finally, and I never resisted her at all.

20        MS. BAKER:  Well, it's not the first time we've dealt

21   with law enforcement that hasn't been totally upright.

22              (Audio stopped.)

23         Q.  (By Mr. Wood) So Diane says, that's not the

24   first time we've dealt with law enforcement that's not

25   totally upright, correct?

1                    (Audio played as follows:)

2        DETECTIVE BARLOW:  He did not do as he was instructed

3   to do.

4        MS. BAKER:  Oh.

5                    (Audio started again as follows:)

6        MS. BAKER:  -- her friend.  You would tell her, why

7   don't you use the other way.  Go ahead and drive up that

8   driveway.  You know, you (inaudible) friends with these

9   people.  They have the upper hand.  That would be the smart

10  thing if you were her friend.

11       DETECTIVE BARLOW:  No.  I stay completely neutral of

12  this.  Friends or no friends, you cannot block someone from

13  going to work.

14       MS. BAKER:  She's not blocked.

15       DETECTIVE BARLOW:  When I got --

16                    (Audio stopped.)

17       Q.  (By Mr. Wood) So you said, friends or no

18  friends, you can't block someone from going to work,

19  correct?

20       A.  I did.

21       Q.  And is that a reference to you felt like he

22  had falsely imprisoned her?

23       A.  Yes.

24       Q.  And then you just said, before I paused it,

25  you just said, when I got here --

 1                    (Audio played as follows:)

 2        DETECTIVE BARLOW:  You were behind her, and he was

 3   ahead of her.

 4        MS. BAKER:  (Inaudible.)

 5        DETECTIVE BARLOW:  He locked the gate when I was

 6   standing here.

 7                    (Audio stopped.)

 8        Q.  (By Mr. Wood) So that was a reference to that

 9   he locked the gate while -- that Art had locked the

10   gate while you were interviewing Christine, right?

11        A.  You can hear it on the audio, the chain on the

12   gate.

13                    (Audio played as follows:)

14        MR. BAKER:  (Inaudible) she blocked me the other day

15   whenever my wife was with me.  We were trying to get out and

16   go to town.  She came storming in there, buzzed right up to

17   me, and wouldn't get out of my way so I could leave.

18                    (Audio stopped.)

19        Q.  (By Mr. Wood) So he said that the other day

20   Christine had blocked her, blocked Art on Legacy Drive

21   and wouldn't let them out of the way; is that correct?

22   Is that what he told you?

23        A.  That's what he said, but I don't know about that.

24        Q.  Okay.

25        A.  I didn't respond, or if they even called the

1        A.  I don't think so.

2        Q.  Were you involved at all in that

3   investigation?

4        A.  No.

5        Q.  Do you know who was?

6        A.  No.

7        Q.  All right.  After the events we just listened

8   to Officer Russell, Orofino Police Officer Russell,

9   arrived; is that correct?

10        A.  Yes.

11        Q.  And we have a video of that.  I'm not going

12   to go through that here.  Officer Russell, he

13   eventually ended up loosening Art's handcuffs?

14        A.  I did prior.

15        Q.  Oh, you did it before?

16        A.  I did.

17        Q.  Okay.  And he -- and Art said he was still in

18   pain from it, correct?

19        A.  No.  I asked him, is that better, and he said,

20   yes.

21        Q.  Okay.

22        A.  Because he kept making comments that they hurt,

23   and I felt like things are calm now.  He's calm.  Everything

24   is okay.  My backup, I didn't know where it was.  I didn't

25   tell them to respond code, and it was about eight minutes

1    from the time I put the cuffs on until I adjusted them.

2    Even verbally talked about, is that better?  And he said,

3    yes.  And then I talk about double locking them.

4           Q.  And Officer Russell was involved in assisting

5    you; is that right?

6           A.  That was when he got there, then we took my cuffs

7    off and put his cuffs on, but I had already adjusted them

8    prior to Officer Russell getting there because he was saying

9    they hurt.  And I felt comfortable enough, then, that I

10   could adjust them and make them more comfortable.

11          Q.  That was before Russell arrived?

12          A.  Yes.

13          Q.  When Russell arrived he eventually went to

14   put Art into the patrol car, correct?

15          A.  Yes.

16          Q.  And there's a bit of a step up into the

17   pickup -- back of that pickup, correct, or it was a

18   truck for --

19          A.  Yeah, a Dodge 1500s, yeah.

20          Q.  Okay.  And Art was having a hard time getting

21   in; is that right?

22          A.  I don't remember that.  It would be on the video.

23          Q.  Okay.  I can --

24          A.  I think he said something to the effect of needing

25   some help, Officer Russell.  I was standing back then.